[949 NYS2d 50]

Wo Yee Hing Realty Corp., Appellant, et al., Plaintiffs, v Howard Stern, Esq., Respondent.

First Department, July 31, 2012

### APPEARANCES OF COUNSEL

*Drabkin & Margulies*, New York City (*Caitlin A. Robin* of counsel), for appellant.

*Braverman & Associates, P.C.*, New York City (*Tracy M. Peterson* of counsel), for respondent.

### OPINION OF THE COURT

Saxe, J.P.

The issue presented in this legal malpractice action is whether plaintiff has offered sufficient proof to create a triable issue of fact as to whether defendant's alleged malpractice proximately caused its claimed losses.

Plaintiff Wo Yee Hing Realty Corp. is a family-owned real estate holding corporation; its principals are brothers Chun Yee Yung, Chun Hing Yung, and Chun Wo Yung, who sued individually until they voluntarily discontinued their claims in June 2008, leaving the action to proceed in the name of the corporate plaintiff. Defendant Howard Stern is an attorney who serves as the administrator of a legal services plan offered to landlords by the Rent Stabilization Association since 1994. In 2006, one of plaintiff's principals contacted defendant seeking assistance on several landlord-tenant issues; he also asked defendant to represent plaintiff in the sale of a residential and commercial building it owned, located at 496 Broadway, in Manhattan.

The parties' claims as to the understanding that was reached regarding the corporation's retention of defendant are diametrically opposed. According to plaintiff's principals, defendant assured them that the anticipated sale could be structured as a "like-kind exchange" under Internal Revenue Code (26 USC) § 1031, which permits taxes on gains from the sale of real property to be deferred if the seller purchases another property of like kind, within certain parameters (*see* 26 USC § 1031 [a]). Plaintiff asserts that defendant "held himself out as knowledgeable in [1031 exchanges] and able to effectuate the sale and transfer of real property" to enable it to take advantage of the capital gains tax deferral.

Defendant, however, asserts that he informed plaintiff's principals that he "had no expertise or experience with structuring Section 1031 like-kind exchanges" and that responsibility for taking advantage of section 1031 would fall to them, and that they assured him that they were familiar with 1031 exchanges and would take care of that aspect of the transaction.

In late October 2006, plaintiff provided defendant with a written offer from a third party to purchase 496 Broadway for $10.2 million, with a down payment of $1 million. In early November 2006, defendant drafted a contract of sale and forwarded it to one of plaintiff's principals and to the purchaser. On November 17, 2006, defendant met with plaintiff's representatives, the purchaser and the purchaser's attorney and real estate agent. On that date, Chun Wo Yung states, he and his brother Chun Hing Yung told defendant that the sale "must be a '1031 sale,' " although Chun Wo admits that he "did not really know what that meant." Chun Wo nonetheless avers that defendant "said he would write a proper clause in the contract and make sure that the sale complied with all requirements."

Defendant agrees that he and the Yungs spoke on November 17, 2006, just before the meeting with the purchaser. Defendant asserts, however, that he advised the Yungs that he "did not have the requisite experience to handle [the 1031] aspect of the transaction," and suggested that they make a joint call to the Yungs' accountant to discuss the issue. Defendant contends that, between the November 17 meeting and the closing, he repeatedly asked Chun Wo whether things were in place for the 1031 exchange. According to defendant, Chun Wo assured him that he was working with his accountant to take care of the 1031 issue.

The closing on the sale was held on May 29, 2007. During the closing, the purchaser's bank asked if the checks should be made payable to plaintiff. Plaintiff alleges that defendant said that the checks should be made payable to the plaintiff corporation "for the purpose of the 1031 exchange." Defendant, by contrast, avers that he asked Chun Wo and Chun Hing if the checks should be made payable to plaintiff, and they said yes. Defendant adds that the purchaser's counsel "echoed" defendant's concerns about the checks being made payable to plaintiff, but Chun Wo and Chun Hing "were steadfast and insisted" that the checks be made out that way.

Immediately after the closing, according to defendant, the Yungs conversed in Chinese, and then handed the checks to him and told him to "process the 1031." Defendant maintains that he then told the Yungs that he had been doubtful that the 1031 exchange could be consummated if plaintiff received the funds directly, but he acknowledges that the Yungs told him to hold onto the checks and "see what could be done" about effecting the 1031 exchange.

Defendant then contacted an attorney who specialized in 1031 property exchanges, who informed defendant that, to effect the 1031 exchange, the closing would have to be undone, redone, and redated. He advised defendant that the purchaser would have to consent to this action, and would most likely want monetary compensation for doing so. Defendant conveyed this information to the Yungs. Chun Wo contacted the buyer, who replied that plaintiff would have to pay it $600,000 in order to redo the transaction. Plaintiff retained new counsel, and, several weeks later, retrieved the checks from defendant, but did not attempt to redo the transaction.

Chun Hing, the brother who took the lead in finding a replacement property, said that he considered three properties in the West 30s, at prices ranging from $22 million to about $40 million, that his bid of $22 million for 28 West 36th Street was rejected, and that following negotiations on 35 West 36th Street, a "verbal[ ] . . . understanding" was reached that plaintiff would buy that property for $31.5 million. He testified at his deposition that the broker gave him a contract; however, the record includes no contract of sale or other writing to reflect this "understanding." In fact, the owner of the property testified that plaintiff's original offer "wasn't a good offer and it never materialized."

Plaintiff contends that defendant's negligence caused it to be unable to effect the 1031 exchange, as a result of which it realized a large capital gain and was subject to an immediate $5.1 million in tax liability. Further, plaintiff maintains, this tax liability prevented it from using the full building sale proceeds to acquire another property, resulting in further economic opportunity loss. The parties cross-moved for summary judgment.

The motion court granted defendant's motion and denied plaintiff's cross motion (*Wo Yee Hing Realty Corp. v Stern*, 30 Misc 3d 1237[A], 2011 NY Slip Op 50378[U] [2011]). It agreed with defendant that regardless of the triable issues of fact as to defendant's alleged malpractice, plaintiff had failed to offer evidence that such negligence was a proximate cause of any injury, by failing to produce any documentary evidence that it could have identified the replacement property within 45 days of the closing, or closed on the acquisition of a replacement property within 180 days of the sale of the initial property, both of which are required for the tax benefits of section 1031 to take effect (*see* 26 USC § 1031 [a] [3] [A], [B]). We now affirm.

■ To prevail on its claim of legal malpractice, plaintiff must prove not only that defendant was negligent, but also that de-

fendant's negligence was a proximate cause of its losses (*Brooks v Lewin*, 21 AD3d 731, 734 [2005], *lv denied* 6 NY3d 713 [2006]; *see also Markowitz v Kurzman Eisenberg Corbin Lever & Goodman, LLP*, 82 AD3d 719 [2011]). Indeed, the failure to show proximate cause "mandates the dismissal of a legal malpractice action regardless of whether the attorney was negligent" (*Leder v Spiegel*, 31 AD3d 266, 268 [2006], *affd* 9 NY3d 836 [2007], *cert denied* 552 US 1257 [2008]).

■ Strong evidence that defendant acted negligently is presented by his admission that he told the Yungs that he was not qualified to handle a 1031 exchange, but nevertheless undertook the preparation of the contract of sale.

> "[A]n attorney is obligated to know the law relating to the matter for which he/she is representing a client and it is the attorney's duty, if he has not knowledge of the statutes, to inform himself, for, like any artisan, by undertaking the work, he represents that he is capable of performing it in a skillful manner" (*Fielding v Kupferman*, 65 AD3d 437, 440 [2009] [internal quotations marks omitted]).

Defendant's failure to have the checks made payable to a qualified intermediary similarly constitutes evidence of his negligence, since that failure would preclude plaintiff from taking advantage of the like-kind exchange option (*see* 26 CFR 1.1031[k]-1 [f]).

■ In seeking summary judgment dismissing the case, defendant contends that plaintiff cannot show that his negligence, if any, caused plaintiff's alleged losses. He relies on the absence of evidence of a pending deal that plaintiff could have used to consummate a 1031 exchange. Plaintiff argues, citing *Suppiah v Kalish* (76 AD3d 829, 832 [2010]) that defendant was required to submit an expert affidavit establishing that even if he did commit malpractice, his actions were not the proximate cause of its losses. However, *Suppiah* concerned an allegation of attorney malpractice in an immigration matter that involved issues so "byzantine" that the issue of proximate cause could not be resolved without expert testimony (*id.* at 833). Here, by contrast, the mechanics of the governing legal framework are undisputed, and the issue of proximate cause turns on the discrete factual question of whether plaintiff took the requisite actions to identify and purchase a suitable replacement property in the required time frame. There is no need for expert testimony on the point.

The question is therefore whether plaintiff raised an issue of fact as to whether negligence on defendant's part proximately caused its claimed losses.

To be eligible for the tax benefit, plaintiff, as the seller, would have had to designate a specific replacement property within 45 days of the sale of its building, in a written and signed document transmitted to the person obligated to transfer that property to plaintiff or to another person involved in the exchange; to have a qualified intermediary receive the proceeds of sale of the relinquished property; and to close on the purchase of the replacement property within 180 days of the initial sale (26 USC § 1031 [a] [3] [A], [B] [i]; 26 CFR 1.1031[k]-1 [c] [2]; [g]).

■ Unlike the dissent, we do not think that defendant's failure to have the checks made out to a qualified intermediary eliminates plaintiff's burden to offer evidence showing that but for defendant's negligence, it would have been able to complete a valid like-kind exchange. Although it is now clear that, as the dissent puts it, "the opportunity for a like-kind exchange was irretrievably lost once plaintiff received the proceeds of the sale," it is also clear that plaintiff had failed to satisfy all the other elements required for the successful completion of such an exchange, and that the failure to meet those requirements is not attributable to defendant's alleged negligence.

We do not suggest that plaintiff had to actually purchase a new property *without* the benefit of a like-kind exchange; nor do we impose a requirement that it make the futile gesture of identifying the definitive replacement property. We merely hold that plaintiff had the burden of presenting some evidence that it *could have* completed a like-kind exchange had defendant advised it properly. It needed only to identify the proposed replacement property and show that it would have been able to purchase that property using the like-kind exchange procedure if the matter had been properly handled. If the proposed replacement property were valued at more than the proceeds of the sale of its building—$10.2 million—then plaintiff would also have had to prove its ability to finance the additional cost. But, the mere fact that plaintiff had funds enough to purchase a replacement property for $10.2 million or less does not suffice to create an issue of fact. Plaintiff failed to present any evidence that it had identified any property that it was capable of buying within the statutory time frame. Nor did it present any evidence that it could have closed on its purchase within 180 days. As to the West 36th Street property, plaintiff's claim that it had

an oral understanding that it would purchase the property for $31.5 million is insufficient, as is its vague claim, unsupported by any documentation, that Chun Hing "received a contract" that he "deemed suitable for the purpose of the 1031 exchange." None of this is sufficient to show that plaintiff would have been able to timely designate a property and effectuate a section 1031 like-kind exchange.

Plaintiff also failed to show that it was capable of consummating the acquisition of the West 36th Street property. While the proceeds of the sale of its property were approximately $10.2 million, the purported agreed-on price to acquire West 36th Street as a replacement property was $31.5 million. Yet, plaintiff's sole evidence as to its financial ability to acquire the replacement property lies in the testimony of Terry Mang, an officer of United Commercial Bank who purportedly had "preliminary conversations" with plaintiff's representatives about financing. Mang testified that some time in 2007, he told Chun Hing that, if he put down 10%, the bank would be able to finance up to 65% of a purchase. But, Mang was not only unable to specify when this conversation took place; he also stated that Chun Hing never told him which building would be the subject of the financing, the intended purchase price, or the amount of the financing. Indeed, Mang clarified that the bank never opened a file on the matter, but merely expressed general interest in financing a purchase. We do not suggest that plaintiff had to obtain a "virtual mortgage," as the dissent argues. However, lending institutions may give a preliminary indication of whether a loan applicant would be eligible for a loan.

Since the acquisition of a replacement property within 180 days is essential to the consummation of a 1031 exchange, and plaintiff's showing is insufficient to demonstrate that it was in a position to acquire the alleged replacement property, plaintiff has failed to demonstrate the existence of a material issue of fact as to a causal link between its inability to effect a 1031 exchange and defendant's alleged negligence.

Accordingly, the order of the Supreme Court, New York County (Debra A. James, J.), entered February 22, 2011, which, insofar as appealed from as limited by the briefs, granted defendant's motion for summary judgment dismissing the complaint, should be affirmed, without costs.

DeGrasse, J. (dissenting). I disagree with the majority's conclusion that defendant is entitled to summary judgment on

the instant legal malpractice cause of action. I would therefore reverse Supreme Court's order and deny the motion.

According to the complaint, this action stems from a failed like-kind exchange of business property pursuant to Internal Revenue Code (26 USC) § 1031. Plaintiff claims to have incurred a substantial tax liability that could have been avoided or deferred but for defendant's negligence.

The main purpose of a like-kind or 1031 exchange is to defer the capital gains tax resulting from the sale of commercial or investment property (*see In re 1031 Tax Group, LLC*, 420 BR 178, 184 [SD NY 2009]). This tax advantage is gained through a "deferred exchange" by which "pursuant to an agreement, the taxpayer transfers property held for productive use in a trade or business or for investment (the 'relinquished property') and subsequently receives property to be held . . . [similarly] (the 'replacement property')" (26 CFR 1.1031[k]-1 [a]). 26 CFR 1.1031(k)-1 (g) (4) enables a taxpayer to carry out a 1031 exchange by use of a "qualified intermediary."* For a 1031 exchange to be effective, a taxpayer must (a) give written notice identifying the replacement property within 45 days after the transfer of the relinquished property (the "identification period") and (b) receive the identified replacement property within 180 days after the said transfer (the "exchange period") (26 CFR 1.1031[k]-1 [b]).

Defendant, an attorney, was retained to represent plaintiff in connection with the sale of its building located at 496 Broadway. Plaintiff and defendant discussed a written offer from the eventual purchaser that referenced a proposed closing "upon 90 days notice by the seller to identify his 1031 tax exchange needs." Defendant states in his affidavit that he advised Chun Wo Yung and Chun Hing Yung, two of plaintiff's principals, that he lacked the requisite experience in structuring 1031 exchanges and that that aspect of the deal would have to be handled by the client. Chun Wo Yung states in his affidavit that defendant indicated that "handling the 1031 exchange would not be a problem, and that he [defendant] would take care of all the necessary paperwork to get it done." In any event, it is undisputed

---

* A qualified intermediary is a person, not the taxpayer or one closely related to the taxpayer, who "[e]nters into a written agreement with the taxpayer . . . and, as required by the exchange agreement, acquires the relinquished property from the taxpayer, transfers the relinquished property, acquires the replacement property, and transfers the replacement property to the taxpayer" (26 CFR 1.1031[k]-1 [g] [4] [iii]).

that defendant prepared a contract of sale with a rider that cited Internal Revenue Code (26 USC) § 1031 and expressly provided for the assignment of the parties' rights to a qualified intermediary for purposes of a like-kind exchange.

At the May 29, 2007 closing, checks representing the $10.2 million purchase price were cut and made payable to plaintiff instead of to a qualified intermediary. Chun Hing Yung states in his affidavit that the proceeds were disbursed that way under defendant's advice. Defendant, on the other hand, states in his affidavit that the checks were made payable to plaintiff at the insistence of plaintiff's principals. 26 CFR 1.1031(k)-1 (f) provides that

> "[i]f the taxpayer actually or constructively receives money or other property in the full amount of the consideration for the relinquished property before the taxpayer actually receives like-kind replacement property, the transaction will constitute a sale and not a deferred exchange, even though the taxpayer may ultimately receive like-kind replacement property."

Therefore, the direct payment of the purchase price to plaintiff foreclosed section 1031 treatment.

On this record, I share the majority's view that there is strong evidence that defendant acted negligently in undertaking to represent a client in a transaction that he was not qualified to handle. To say the least, there is an issue of fact as to whether defendant apprehended the section 1031 provision of the contract he drafted. I disagree, however, that plaintiff failed to demonstrate the existence of a material issue of fact as to a causal link between its inability to effect a 1031 exchange and defendant's alleged negligence.

As the majority sees it, "the issue of proximate cause turns on . . . whether plaintiff took the requisite actions to identify and purchase a suitable replacement property in the required time frame." I disagree with this analysis because under 26 CFR 1.1031(k)-1 (f), the opportunity for a like-kind exchange was irretrievably lost once plaintiff received the proceeds of the sale. Stated differently, there was no 1031 exchange, and the 45-day identification period and the 180-day exchange period were never triggered, because of plaintiff's actual receipt of the proceeds of the sale. Therefore, it would have been impossible for plaintiff to purchase or even identify anything that qualified as replacement property. It would also have been pointless for

plaintiff to go through the motions of doing so once it received the proceeds of the sale. "[T]he law does not require futile gestures" (*Glauber v P. S. F. B. Assoc.*, 89 AD2d 576, 577 [1982]; *Lo Biondo v D'Auria*, 45 AD2d 735, 737 [1974]).

The majority dwells unnecessarily on whether plaintiff had the means of acquiring a replacement property. The record provides no reason to assume that the $10.2 million realized from the sale would have been insufficient for the purchase of a replacement. Had a 1031 exchange been effected, a qualified intermediary would have acquired, paid for and transferred to plaintiff a replacement property priced at up to $10.2 million, at no cost to plaintiff save incidental expenses. This undeniable $10.2 million in purchasing power is, at least, sufficient to raise an issue of fact as to whether plaintiff had the means of completing the contemplated 1031 exchange. Although plaintiff discussed a deal for a more expensive property, nothing in the record suggests that it was required to identify a replacement property that was priced at more than the $10.2 million sale price of its building.

I also respectfully submit that the majority's holding is unrealistic because it essentially provides that in order to successfully oppose defendant's motion for summary judgment, plaintiff was required to demonstrate its financial ability by (a) purchasing a new property without the benefit of a tax-deferred exchange or (b) somehow obtaining a virtual mortgage commitment without showing a prospective lender an executed purchase agreement for a new property. Also, the "preliminary indication of whether a loan applicant would be eligible for a loan" mentioned by the majority would have been inadmissible, speculative and unnecessary in the case of a replacement property priced at $10.2 million or less.

SWEENY, RENWICK and RICHTER, JJ., concur with SAXE, J.P.; DEGRASSE, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered February 22, 2011, affirmed, without costs.